28  179
38  380

---

## J. M. LIENPO v. THE STATE.
### *No. 3263.    Decided November 6.*

1. **Practice—Evidence.**—On a trial for murder the State proved by two witnesses the statements of the defendant to the magistrate at the time of his examining trial, the predicate being fully laid as provided by article 750 of the Code of Criminal Procedure. To this proof it was objected that the defendant was intoxicated at the time he made the said statements. *Held,* that the objection was properly overruled, because (1) it was not made to appear that at the time he made the said statements he was intoxicated to that degree that he was incapable of understanding the warning and caution administered to him, nor incapable of making an intelligible statement of the facts; and (2) because while his mental condition at the time of making the statements was proper matter for the consideration of the jury in weighing his testimony, it was not sufficient ground upon which to exclude his statement from the jury.

2. **Same—Depositions** in criminal cases to be available as evidence must be filed in the cause at least one entire day before the commencement of the trial. Objections to the form of taking such depositions must be made in writing, and notice given to the opposite party. The exclusion of a deposition taken beyond the State, and offered by the defendant, is the question raised in this case; but the bill of exceptions showing that the objection urged on the trial by the State was merely to the form of taking and re-

turning the same, fails to show that the said depositions were filed in the cause at least: one entire day before the commencement of the trial. In such state of case the presumption obtains that the depositions were not filed in time, and that the court did not err in excluding them upon the ground that they were not taken and returned by an officer authorized by law to take them.

3. Same—A Notary Public is not an officer authorized by law to take depositions in criminal cases beyond the limits of this State.

4. Manslaughter—Charge of the Court.—See the statement of the case for the substance of evidence *held* to have demanded of the trial court a charge upon the law of manslaughter.

Appeal from the District Court of Wise. Tried below before Hon. J. W. Patterson.

The conviction in this case was in the second degree for the murder of. Jack Connell, in Wise County, Texas, on the 27th day of May, 1889. The penalty assessed against the appellant was a term of sixteen years in the penitentiary.

Mr. Watson, the first witness for the State, testified that he and Nelson were joint proprietors of a saloon in Rhome, Wise County, Texas. Witness went into his saloon about five o'clock on the evening of Sunday, May 26, 1889. He was joined in that saloon by the defendant, who asked him if he had a gun. Witness replied that he had, and defendant proposed to pay witness two dollars for the use of it for one hour. Witness; replied that he did not rent his gun, but would lend it to him for that length of time. He then asked defendant what he wanted with the weapon. Pointing to his eye, which was black and swollen, defendant. replied, "Do you see that eye? Jack Connell gave me that eye, and I. have always said that no man can black my eye and live. I will kill him before morning." Witness then told the defendant that he could not get. his gun for that purpose. He then expostulated with defendant about. his expressed purpose to kill deceased, and remarked to him, "If you can't fight him with your fists, get a stick and beat him." Defendant. finally remarked that perhaps it was best to do as suggested by the witness. Deceased was a much larger man than defendant.

When witness opened his saloon on the next morning deceased came: in, and witness invited him to take a drink. He did so, and sat down on a long bench in the saloon. Soon afterwards defendant came in and witness invited him to take a drink. He did so, and sat down on the same bench occupied by deceased. Several minutes afterwards Nelson came to the saloon, and the witness went to breakfast, leaving defendant. and deceased seated on the bench. They were still seated on the bench when the witness returned, and Nelson was sitting behind the bar counter. Presently Mr. Curry came in and ordered a small flask of whiskey. Nelson served him, and he and Nelson then joined witness on the small porch in front of the saloon. About the time Nelson and Curry reached the. witness the defendant left the bench and went behind the counter. Nel-

son ran back behind the counter and seized the defendant just as he got possession of a pistol that was lying on the low shelf behind the counter. A struggle for the possession of the pistol then ensued between Nelson and defendant. Defendant ordered deceased to get out of the saloon, Nelson at that time still struggling to get hold of the pistol. Deceased started towards the front door, and then turned and went towards the side door, and just before he reached the side door defendant released his pistol arm from the grasp of Nelson, threw the pistol over Nelson's head and fired, the deceased falling at the crack of the weapon. Defendant manifested a disposition to shoot again, out Nelson disarmed him. He then looked at deceased, left the saloon hurriedly, and ran off. Witness got his gun and followed a few minutes later. He overtook defendant in an out field, about three-fourths of a mile distant, and arrested him. He then had a valise packed with wearing apparel, and a half-pint bottle full of whiskey. He was then sober, and was sober when he fired the fatal shot, but on his return to the saloon began to drink, and soon drank all the whiskey he had in his bottle. The witness did not hear a word spoken by either the defendant or the deceased to the other prior to the shooting. The deceased at no time in the presence of the witness attempted to strike defendant. He was unarmed when shot, and lived about two hours after he received the fatal wound. Witness did not see either Philip Kopf or Pat Sheley on that morning prior to the shooting.

Mr. Nelson, the second witness for the State, gave substantially the same account as Watson of the immediate transaction, and in addition stated that no words, friendly or otherwise, passed between the defendant and deceased during the time Watson was gone to breakfast. Witness was behind his bar until immediately before defendant rushed behind the counter and seized the pistol, and he was satisfied that if the parties had quarreled or spoken to each other he would have heard them. Philip Kopf and Pat Sheley came into the saloon and took a drink during the absence of Watson, and it was the recollection of the witness that the defendant took a drink about the time Watson came back. The words spoken by the defendant to the deceased, just before the fatal shot was fired, and after he had secured the pistol, as the witness understood them, were, "I will give you just ten minutes to leave the town; get out!"

On his cross-examination the witness stated that the defendant and Philip Kopf came into the saloon on Sunday evening—the evening preceding the homicide—and asked for beer. Witness refused to sell it to them, but treated them. As defendant and Kopf started to the bar the deceased entered and asked, "Are you going to drink without treating me?" To this query the defendant made no reply, and deceased struck him a sudden back-handed blow on the head or face, knocking defendant down. He got up, washed his face, took a drink, and he and Kopf left the saloon. Deceased left as soon as he knocked defendant down. Soon after-

wards witness saw defendant and deceased on the depot platform. They were then quarreling. Deceased kicked defendant's hat off. As he did so defendant threw what witness took to be a knife on the platform. De-ceased picked up the knife and threw it away. A few minutes later witness saw them shake hands, and he did not see them again until the next morning. Defendant had taken a drink on Sunday evening, but neither he nor the deceased were drunk.

Green Baker and Bob Carpenter testified for the State that they were present and witnessed the altercation between defendant and deceased on the depot platform on Sunday evening. The defendant manifested an anxiety to fight the deceased, but was restrained by another section hand. They quarreled about ten minutes, when deceased kicked defendant's hat off. Defendant then threw an open pocket knife to the platform, which the deceased picked up and threw away. Another section hand recovered the knife, and soon afterwards the defendant and the deceased shook hands.

Charles Peterson, the section "boss" to whose "gang" the defendant was attached, was the next witness for the State. He testified that he met the defendant on the depot platform in Rhome on Sunday evening. Defendant called witness's attention to his eye, which was bruised but not swollen, and said to him, "Jack Connell hit me there. I will cut his belly open! I will cut his throat from ear to ear! I will cut his heart out, and stamp on it!" Witness protested that he should not say such things, but he repeated the threats at least a half dozen times. Defendant was then drinking, but was not "full." The witness next saw defendant about six o'clock on the following morning. He got up at that hour with something in his right hand, went to the door in his sock feet, and carefully looked over the portico on which deceased had been in the habit of sleeping. He then went back to bed. Deceased slept in the lumber yard on that Sunday night. Defendant left the section house early that morning, and did not come back until after the killing, when he got his valise and left. Defendant did good work as a section hand, and witness never heard him complain of pains in the back.

James Flynn testified for the State that he met the defendant late on Sunday evening, when defendant called his attention to his black eye. He said that deceased blacked it, and that he intended to cut deceased's belly open, and his heart out; that deceased was a larger man than he was, but that deceased would "go to bed that night, when he would cut his, deceased's, guts out, and show them to him." Defendant was excited, but not drunk.

A. C. Hill testified, in substance, that as justice of the peace he held the inquest upon the body of the deceased on the 27th day of May, 1889. Defendant was present, lying on a bench, apparently asleep. When witness waked him up he showed to have been drinking. He had Kopf

sworn as a witness in his behalf. Witness took Kopf's testimony down, and announced that the examining trial would be held at his office in Aurora, two miles distant. When he opened his court that evening the witness told defendant that he would adopt the testimony taken on the inquest for the State; that he, defendant, could not be required to make a statement, but was at liberty to make one if he so desired, but that if he did make it, it could be used in evidence against him. Defendant proceeded to talk in a rapid, incoherent manner, when witness told him that he did not think he, defendant, was in a condition to proceed with the trial, and that if he desired he, witness, would adjourn the hearing for two or three days, to enable him to get counsel, and that if he could not employ counsel he, witness, would assign him counsel. Defendant insisted upon proceeding, and stated, in substance, that he killed deceased because deceased struck him the day before; that he did just what any other man would have done, and would do it again under similar circumstances. After some further incoherent talk, defendant said, "Well, no, I did not kill him, the pistol did it. Well, I'll sit down." Witness thought the defendant drunk at the inquest, but he had sobered up when the examining trial began.

Sheriff Gilbert corroborated the testimony of Mr. Hill as to the statement of defendant on the examining trial, and added that, while making that statement, the defendant pointed to Pat Sheley, then in the court room, and said, "I told that man I would kill him (deceased) for blacking my eye. Now I have done it. I don't regret it, and I would do it again." The State closed.

A. C. McLennon and G. W. Patterson testified for the defense that the defendant worked for them as a section hand, respectively in 1887 and 1888, and that while in their service he complained a great deal of weakness of the back. Defendant's reputation for truth and veracity was good.

The defendant took the stand and testified in his own behalf, in substance, that he and Philip Kopf went to Nelson & Watson's saloon on Sunday evening to get a drink. While at the bar the deceased, whom the witness knew but slightly, stepped forward and asked witness if he was going to drink without treating him. Witness made no reply, but after drinking, turned to leave the saloon. About the time he left the bar the deceased struck him a blow in the eye which knocked him down and rendered him senseless for a few moments. Witness gave the deceased no provocation whatever. The next time the witness saw the deceased was on the same evening, on the depot platform. While the witness was standing on the lower platform the deceased came up, jumped on the upper platform, and kicked witness on the side of the head, without cause or provocation, the witness not having spoken a word to him. Witness had taken a great deal of whiskey and some morphine on that

day, and at the time of the assault on the platform was suffering greatly from his wounds, his eye being much swollen and nearly closed.    He had no recollection of making threats against deceased after that assault, but he was under the influence of whiskey and morphine, which he had taken in large quantities.    He lay out on the railroad track nearly the whole of that night, going to the section house but a short time before day.    He got up early next morning, crossed to the car house, behind which he urinated, and then returned to the section house.    From the section house he looked toward the depot, on the platform of which he saw the deceased standing.    As soon as deceased saw witness he started toward witness, shaking his fists.    Witness went upstairs.    Deceased soon came into the room, but said nothing.    Witness then left and went to the saloon.    Deceased soon came into the saloon, and after going out and coming in again he took a seat on a bench, near the end of which the witness was seated in a chair.    After awhile Mr. Nelson and Mr. Watson went to the portico of the saloon.    About that time deceased turned to witness and said to him, "You d—d fine-haired French son-of-a-bitch, I am going to make you s—k me off to-day!"    Witness ran behind the counter, seized a pistol, and told deceased to "get out."    Deceased started towards the door, about which time Nelson caught witness and attempted to take the pistol from him.    Deceased then turned toward witness, who had the pistol presented.    The pistol, which was a double-action or self-cocking pistol, was discharged unexpectedly to witness.    Witness did not intend to fire that shot, and did not attempt to shoot again.    His object in seizing the pistol was to protect himself, and he could easily, had he so desired, have shot the deceased two or three times before Nelson caught him.    He kept the deceased covered with the pistol after Nelson caught him to keep him, deceased, off.    Deceased was, a much larger man than witness, and could have taken the pistol from him while Nelson held him.

As soon as the shot was fired the witness released the pistol to Nelson and left by the back door, not knowing at that time whether or not the shot had taken effect.    From the saloon he went to the section house, got his valise, and thence went to an old field, in which he was arrested.    The witness was the only American laborer on the section, and was not liked by his fellow-workmen.    They often called him "that American yap," and remarked in his hearing that "these d—d American hoosiers ought to be kept off the railroads."    The witness had but little recollection of what occurred on Sunday, the day preceding the killing.    He had been drinking heavily and taking morphine all day.    He began drinking on Saturday.    He had no recollection of talking about deceased on Sunday to either Peterson, Flynn, Morris, or Watson.    He took three or four drinks and two doses of morphine on the fatal morning before the shoot-

ing, and had eaten no breakfast. He remembered nothing that transpired on the inquest.

No brief for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE. — It appears from the testimony that defendant's statements made to the justice of the peace, as testified to by the witnesses Hill and Gilbert, were voluntarily made by him after he had been fully warned and cautioned by said justice of the peace that any statement he might make about the killing might be used in evidence against him. We think said statements were admissible as evidence against him under article 750 of the Code of Criminal Procedure. That at the time of making said statements he was in an intoxicated condition did not render his said statements incompetent evidence, as it did not appear that he was intoxicated to that degree that he was incapable of understanding the warning and caution administered to him, nor incapable of making an intelligible statement of the cause and circumstances of the homicide. His mental condition at the time of making said statements was a proper matter for the consideration of the jury in weighing the evidence, but was not a sufficient ground for excluding said statements from the jury.

We are unable to determine from defendant's bill of exception that an error was committed in excluding the depositions offered by him. It does not appear from the bill that said depositions had been filed in the cause at least one entire day before the commencement of the trial. It is true that the objection made to the depositions was merely to the form of taking and returning the same (Adams v. The State, 19 Texas Ct. App., 250), and if the depositions had been filed in the cause one entire day before the commencement of the trial, said objection should not have been entertained unless made in writing, and notice thereof given to defendant's counsel. Rev. Stats., art. 2235; Code Crim. Proc., art. 762. We must presume that said depositions had not been filed in the cause the requisite length of time, and that therefore the court did not err in excluding them because they were not taken and returned by an officer authorized by law to take them. A notary public is not an officer authorized by law to take depositions in criminal cases when such depositions are taken out of this State. Code Crim. Proc., art. 760.

As we view the evidence it demanded instructions upon the issue of manslaughter. It appears from the evidence that the homicide was committed by the defendant voluntarily and under the influence of passion. It also appears that on the day previous to the homicide the deceased had twice assaulted, beat, and abused the defendant, and the defendant testified that a moment before the killing the deceased again insulted and

threatened him with violence. This testimony we think presented the issue of manslaughter. It should have been submitted to the jury to determine whether or not the homicide was committed under the immediate influence of sudden passion arising from an adequate cause. Defendant requested a special charge upon this issue, which the court refused to give, and did not submit the issue to the jury, concluding, we presume, that the evidence did not fairly raise such issue. This omission in the charge is the only error in it, but as this error is material, the judgment must be set aside.

Wherefore the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Hurt, J., absent.